**David F. Sugerman**, OSB No. 862984
**Nadia H. Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
Tel: 503-228-6474
david@sugermandahab.com
nadia@sugermandahab.com

**Gabriel Chase**, OSB No. 142948
CHASE LAW, PC
2014 NE Broadway Street
Portland, OR 97232
Tel: (503) 294-1414
gabriel@chaselawpc.net

*[Additional counsel listed on signature page.]*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ELLEN URBANI, NATHANIEL WEST, and ROWAN MAHER, Individually and on behalf of all similarly situated individuals,<br><br>          Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>          Defendant. | Civil Action No.  3:23-cv-1920<br><br>**CLASS ACTION COMPLAINT**<br><br>Federal Tort Claims Act<br>28 U.S.C. § 2671 |

Plaintiffs bring this complaint herein alleging as follows:

## **INTRODUCTORY STATEMENT**

"*We cannot understand our present moment without recognizing the lasting damage caused by allowing white supremacy and racial hierarchy to prevail . . .*"

- Bryan Stevenson, Director Equal Justice Initiative

1.

On May 25, 2020, a Black man named George Floyd was murdered in Minneapolis, MN, by Officer Derek Chauvin.  Chauvin held his knee to Floyd's neck for at least eight minutes and 46 seconds while his fellow police officers stood by and casually watched Floyd die.  Floyd's final words were, "I can't breathe."  Chauvin and his fellow officers ignored the pleas for mercy coming from bystanders, including the teenage girl whose footage alerted the world to this particular instance of police brutality.

2.

After George Floyd's gruesome public murder, protests erupted nationwide in support of the Black Lives Matter (BLM) movement and against systemic racism, police brutality, and use of excessive force.  Police met these protests with violence, brutality, and excessive force.

3.

On May 28, 2020, thousands of people began months of sustained protests in Portland. Portland Police Bureau officers met these protests with excessive force in the form of generalized violence, including the use of batons, pepper balls, sonic weapons and, most notably, tear gas, in the midst of a global pandemic that attacked human respiratory systems.

4.

Between June 9, 2020, and June 30, 2020, emergency court orders, city directives, and new police reforms in state law placed limitations on the use of tear gas and other force.

5.

On June 26, 2020, in reaction to the measures taken by state and local actors to de-escalate police violence against protesters, medics, legal observers, press, and the public, former President Trump issued Executive Order 13933, which ordered the deployment of federal agents to Portland.  After the deployment, unidentified federal agents in military fatigues emerged for the first time from the Mark O. Hatfield U.S. Courthouse and engaged with members of the public as enemy combatants.

6.

On July 6, 2020, Kevin Sonoff, spokesperson for the District of Oregon's then-U.S. Attorney Billy Williams, indicated that the ostensible purpose of the deployment was to protect federal property and personnel.[1]  But immediately after their arrival, federal agents sought to quell nonviolent protesters by engaging in crowd-dispersal operations, deploying tear gas and impact munitions well beyond the immediate surroundings of such federal property.

7.

Over the month of July 2020, at the directive of former President Trump, then-Acting DHS Secretary Chad Wolf, and then-Senior Official Performing the Duties of the DHS Deputy Secretary Kenneth Cuccinelli, the federal government unleashed unprecedented and sustained violence and intimidation on the people of Portland.  Federal agents escalated that violence on a

---

[1]     Conrad Wilson, *Federal Law Enforcement Agencies Deployed to Portland Protests*, OPB (July 6, 2020), https://www.opb.org/news/article/federal-law-enforcement-agencies-deployed-to-portland-protests-federal-buildings-personnel/ (last visited Aug. 22, 2023).

nightly basis by targeting nonviolent and non-resisting individuals for injury, assault, or arrest without probable cause.  Federal agents chased down protesters, observers, medics, journalists, and even bystanders through the streets, pursuing them as many as ten blocks beyond the federal property while simultaneously firing potentially lethal munitions, including pepper-spray balls, rubber bullets and flashbang grenades.  Federal agents blanketed numerous blocks of Portland public streets surrounding the courthouse in toxic tear gas and chemical agents during a global pandemic, concealing or blocking the pathways for protestors to safely disperse.  On their own behalf and on behalf of others similarly situated, Plaintiffs bring this action for declaratory relief and damages.

## **JURISDICTION**

8.

Plaintiffs bring this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680.

9.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b).

10.

Each Plaintiff filed a Form 95 within two years of the dates of their harm, and more than six months has passed since each Plaintiff filed their Form 95.  None has received a response from any of the federal agencies to which their Form 95 was sent.

11.

Venue is proper under 28 U.S.C. § 1391(b), because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon, and because Defendant is subject to personal jurisdiction in the District of Oregon.

## PARTIES

12.

Plaintiffs and similarly situated individuals ("class members") attended one or more protests described in this lawsuit.

13.

Plaintiffs and class members gathered in downtown Portland near the Mark O. Hatfield U.S. Courthouse ("Hatfield Courthouse") to protest police violence in support of the Black Lives Matter movement. The class consists of people who, between July 1 and July 30, 2020, lawfully gathered in an area bounded by SW Taylor St. on the north, SW 2nd Ave. on the east, SW Madison St. on the south, and SW 4th Ave. on the west (also referred to herein as "the protest zone") to protest police violence, who were exposed to teargas or other impact munitions, and who, within two years of the date of injury filed a Form 95 with the United States. Based on Plaintiffs' information and belief, the class includes at least 162 people. The following people are excluded from the class: Defendant, class counsel and their employees; any judge who sits on this case and their judicial staff; and any person who has filed a separate claim against the United States for injuries arising from the protests that occurred in the protest zone during the dates alleged in this action.

14.

Defendant's agents and employees, while acting within the course and scope of their agency and employment, discharged tear gas, less-lethal munitions, and sonic grenades directed at Plaintiffs and members of the class.

## CLASS ALLEGATIONS

### 15.

Thousands gathered in the protest zone in the evenings between July 1, and July 30, 2020, and the gathered crowds were exposed to teargas.  Many were shot with sonic grenades and impact munitions, and some were beaten and arrested.  On Plaintiffs' information and belief, at least 162 people filed a Form 95 arising out of their injuries in the protest zone during that time.  This class is so numerous that joinder is impracticable.

### 16.

There are questions of law or fact common to the class, including:

(a)    The composition and amounts of tear gas and chemical agents used by Defendant's employees and agents for crowd control;

(b)    Whether Defendant's employees and agents negligently used tear gas and chemical agents;

(c)    Whether Defendant's employees and agents used excessive force;

(d)    Whether Defendant's employees and agents fired sonic grenades and impact munitions at Plaintiffs and members of the class;

(e)    The crowd control policies under which Defendant's employees and agents operated;

(f)    The training provided to Defendant's employees and agents;

(g)    Whether Plaintiffs and members of the class suffered injury from exposure to tear gas and chemical agents;

(h)    The authority under which Defendant's employees and agents were operating at the time they were deployed to Portland, including their authority to use force

beyond the perimeter of federal buildings and their authority to pursue, gas, beat, shoot, and arrest protesters beyond the perimeter of federal buildings;

(i)    Whether Defendant's employees and agents were authorized to use tear gas and chemical agents and fire munitions at Plaintiffs and members of the class who posed no threat to them;

(j)    Whether Defendant's employees and agents were properly trained and certified in the use of those weapons and munitions;

(k)    Whether, and to what extent, Plaintiffs and members of the class are entitled to discovery of Defendant's surveillance of the protest zone;

(l)    The admissibility of statements made by former President Trump;

(m)    The admissibility of statements made by certain federal officials; and

(n)    Whether Plaintiffs and members of the classes are entitled to recover money damages.

17.

The claims or defenses of the representative parties are typical of the claims or defenses of the class, in that all suffered similar injuries from the same conduct, and all seek the same relief.

18.

The representative parties will fairly and adequately protect the interests of the class in that they have identical claims, they have no disabling conflicts of interest, and they have retained counsel with decades of experience handling class actions, mass torts, police misconduct cases, civil rights cases, and personal injury cases.  Class counsel includes counsel with

extensive experience, including trial, appeal, and settlement of class actions and complex cases in federal and state courts, police misconduct cases, civil rights cases, and injury cases.

19.

A class may be maintained pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the class predominate over questions involving individual members and a class action is superior to other available methods for fairly and efficiently adjudicating this case. An issue class may also be maintained pursuant to Fed. R. Civ. P. 23(c)(4) because a single adjudication of common questions would efficiently dispose all common questions for all claimants.

## **GENERAL FACTS**

### **George Floyd Death May 25, 2020**

20.

Protests across the country have been met with a police system which has become highly militarized, heavily armed, and completely distant from the communities they serve.  The police response to many of the protests involve needless beatings, use of extreme measures by officers in gear which appear to be more like soldiers than police officers.



21.

Protests in Portland, Oregon, in reaction to Mr. Floyd's death commenced in May 2020 and continued each night for more than 88 nights.  While protests occurred all over the City of Portland, in July demonstrators gathered in the evenings in and around the protest zone—that is, around the Hatfield Courthouse and around the Multnomah County Justice Center.  Protesters were chased and/or followed by Defendant's agents and employees as far west as I-405, approximately ten blocks from the Hatfield Courthouse.



**Incursion of Federal Agents**

22.

On July 1, 2020, the Trump Administration deployed federal law enforcement officers and agents to Portland.  According to a statement made by Kevin Sonoff, spokesperson for the then-U.S. Attorney, Billy Williams, on July 6, 2020, the ostensible purpose of the deployment was to protect federal property and personnel.[2]  But immediately after their arrival, federal agents

---

[2]    *See id.*

engaged in crowd-dispersal operations, deploying tear gas and impact munitions well beyond the

immediate surroundings of federal property and with the apparent purpose of quelling lawful

protests in support of Black lives rather than protecting federal property.

23.

On Plaintiffs' information and belief, all or most of the federal agents deployed to

Portland were not adequately trained in the First Amendment rights to assemble and protest,

mass demonstrations, crowd control, or riot control.[3]

24.

Federal agents repeatedly failed to employ de-escalation strategies or tactics to mitigate

violence and protect the rights of peaceful assembly and protest.  Instead, federal agents

escalated violence on a nightly basis by targeting peaceful and lawfully dispersing individuals

for injury or assault without probable cause, pursuing protesters, observers, and journalists

through the streets blocks beyond federal property while simultaneously firing pepper-spray

balls, rubber bullets, and other munitions at them, and blanketing several blocks of Portland

streets surrounding the Hatfield Courthouse in tear gas and flashbang devices, concealing the

pathways for protestors to safely disperse.

25.

On or after July 22, the federal agents built a chain-link fence around the Hatfield

Courthouse and reinforced it with plywood and concrete blocks.  The ferocity, frequency, and

---

[3]    Sergio Olmos, Mike Baker & Zolan Kanno-Youngs, *Federal Officers Deployed in Portland Didn't Have Proper Training, DHS Memo Said*, (July 18, 2020), https://www.nytimes.com/2020/07/18/us/portland-protests.html (last visited Aug. 22, 2023); *see also* Office of Inspector General, *DHS Had Authority to Deploy Federal Law Enforcement Officers to Protect Federal Facilities in Portland, Oregon, but Should Ensure Better Planning and Execution in Future Cross-Component Activities* (Apr. 16, 2021), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2021-04/OIG-21-31-Mar21.pdf.

amount of force used against members of the public escalated.  At the direction of their

supervisors, federal agents also fired munitions from within the safety of the fenced-in portion of

the front steps of the courthouse, and from safe positions several stories up, into crowds of

nonviolent, passively resistant protestors and others.



Tear gas deployed from elevated positions while crowd is standing below.

26.

On July 23, 2020, U.S. District Judge Michael Simon issued a temporary restraining

order ("TRO") in *Index Newspapers, LLC v. City of Portland*, No. 20-cv-1035-SI, exempting

journalists and legal observers from orders to disperse and restraining the U.S. Department of

Homeland Security and the U.S. Marshals Service from arresting, threatening to arrest, or using

physical force directed against any person who they know or reasonably should know is a

journalist or legal observer.  The TRO anticipated, consistent with the U.S. Constitution and

federal law, that "lawful crowd-dispersal orders" would be issued before the deployment of

crowd-control devices.

27.

On or about July 23, 2020, after the entry of a temporary restraining order against federal

officials involved in the July protest response, Mr. Cuccinelli sent an email to Mr. Wolf in

reference to the TRO, saying, "It's offensive, but shouldn't affect anything we're doing."

28.

Indeed, Defendant's agents and employees did not alter their behavior and deployed and

directed excessive force at Plaintiffs and members of the class.

29.

During the class period, federal agents used tear gas in a predictable and frequently

unlawful pattern.  Nightly, between approximately 11:30 p.m. and 1:00 a.m., federal agents

emerged from Hatfield Courthouse and fired tear gas and tossed and launched flashbang

grenades into SW Third Street, Lownsdale Park, and SW Fourth Street, sometimes without any

prior warning and regardless of whether there were triggering acts of protester violence, property

damage, or threats (tossed bottles and fireworks) toward federal agents.  All of the federal agents

were wearing gas masks and full protective riot gear and located either safely inside the

courthouse or behind a fence and other protective barriers outside the courthouse.

30.

After an initial volley of tear gas and flashbang grenades, federal agents fired pepper

balls through and over the fencing at protestors, and flooded the street, shooting protesters with

rubber bullets, pepper-spray balls, and other impact munitions regardless of whether the

protesters were engaged in acts of violence, peacefully dispersing or leaving the area, were in

retreat, or were moving away from federal property or standing blocks away from the federal

courthouse and posing no possible threat to federal property, federal agents, or others.

**Constitutional Right to Protest**

31.

Demonstrations, protest marches, and picketing are clearly protected by the First

Amendment.  People have a right to demonstrate and protest the actions of government officials,

including police officers, without fear for their safety.  "It has been clearly established since time

immemorial that city streets and sidewalks are public fora." *Collins v. Jordan*, 110 F.3d 1363,

1371 (9th Cir 1996).

32.

The government may not prohibit angry or inflammatory speech in a public forum unless

it is (1) directed to inciting or producing imminent lawless action *and* (2) likely to incite or

produce such action.  *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 1829, 23 L. Ed.

2d 430 (1969) (per curiam).  Speech that stirs passions, resentment, or anger is fully protected by

the First Amendment.  *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S. Ct. 894, 896, 93 L. Ed. 1131

(1949) ("[A] function of free speech under our system of government is to invite dispute. It may

indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction

with conditions as they are, or even stirs people to anger.").

**Status of Protestor Rights Prior to Incursion of Federal Agents**

33.

On June 9, 2020, Judge Marco Hernandez issued a temporary restraining order in *Don't

Shoot Portland v. City of Portland*, No. 20-cv-917-HZ, prohibiting the Portland Police Bureau

from using tear gas except when lives or safety of the public or the police were at risk.  In

entering the order, Judge Hernandez specifically found:

> [T]here is evidence that officers have violated the constitutional rights of peaceful protestors, as well as their own department's internal directives and guidelines. Limiting the use of tear gas may mean that officers are unable to stop some property damage. But the unconstrained use of tear gas cannot weigh in the public's interest when this use is likely to exacerbate the transmission of COVID-19, for those engaged in peaceful protest as well as the community at large. The Court therefore finds that the public interest weighs in favor of granting a TRO in this case.

34.

On June 26, 2020, pursuant to stipulation, Judge Hernandez extended the restraining order entered in *Don't Shoot Portland* through July 24, 2020, and expanded its scope to restrict the use of the following munitions in connection with crowd control:

(a) FN303s and 40MM less lethal launchers with or without OC payload are limited to use as outlined in PPB Use of Force Directive 1010, and in addition shall not be used where people engaged in passive resistance are likely to be subjected to the force.

(b) Rubber Ball Distraction Devices ("RBDD") shall be limited to use as outlined in PPB Use of Force Directive 1010. In addition, use of RBDD shall be limited to situations in which the lives or safety of the public or the police are at risk and shall not be used to disperse crowds where there is no or little risk of injury.

(c) Aerosol restraints (handheld OC or "pepper spray") shall not be used against persons engaged in passive resistance, and consistent with PPB Use of Force Directive 1010, members shall minimize exposure to non-targeted persons.

(d) Long Range Acoustical Devices ("LRAD") shall be prohibited for use as a warning signal or distraction tactic and shall be used for announcements only. "Passive resistance" as used above means a person's non-cooperation with a member that does not involve violence or other active conduct by the individual.

35.

On June 30, 2020, Governor Kate Brown signed House Bill 4208 into law, which prohibits the use of teargas on a crowd absent circumstances that constitute a "riot" and absent

fair notice, consisting of: (a) an announcement of the agency's intent to use tear gas; (b) allowance of sufficient time for individuals to evacuate the area; and (c) a second announcement of intent to use tear gas immediately before its use.

36.

Every night of July 2020, Defendant's agents and employees attacked nonviolent, non-resisting protesters.

37.

On July 29, 2020, Governor Kate Brown announced she had reached an agreement with the United States to withdraw all federal agents from the Portland protest effort no later than August 4, 2020.[4]

38.

On July 30, 2020, President Trump Tweeted:[5]



---

[4]     Dirk VanderHart & Conrad Wilson, *Oregon Gov. Kate Brown Announces 'Phased' Removal of Federal Officers From Portland*, OPB (July 29, 2020), https://www.opb.org/article/2020/07/29/oregon-portland-deal-announced-federal-officers-phased-removal/ (last visited Aug. 22, 2023).
[5]     Twitter.com, @realDonaldTrump (July 30, 2020, 6:20 AM), https://twitter.com/realDonaldTrump/status/1288826742539464707?s=20 (last visited Aug. 22, 2023).

15 – COMPLAINT

39.

The day of Governor Brown's announcement, the federal agents occupying the federal courthouse in Portland had increased their use of force and appeared to be defiantly ignoring any efforts or attempts to reduce violence and unlawful use of force.[6]

**Characteristics of Crowd Control Devices Deployed by Federal Agents**

A. Chemical Agents

40.

"Tear gas" is a group of chemical compounds that temporarily make people unable to function by causing irritation to the eyes, mouth, throat, lungs, and skin.[7]  It is a form of poison. People may experience some or all of the following symptoms immediately after exposure: excessive tearing, burning, blurred vision and redness of the eyes, runny nose, burning and swelling within the nose, difficulty swallowing and drooling, chest tightness, coughing, choking sensation, wheezing, shortness of breath, burns and rash on the skin, nausea and vomiting.  It can bring on an asthma attack.  Prolonged exposure or a large dose of gas may cause blindness, glaucoma, or immediate death due to severe chemical burns to throat and lungs and respiratory failure.  There is also anecdotal evidence that tear gas may cause reproductive health concerns for people with uteruses including miscarriages.[8]

---

[6]     Chris McGreal, *Federal Agents Show Stronger Force at Portland Protests Despite Order to Withdraw*, The Guardian (July 30, 2020),  https://www.theguardian.com/us-news/2020/jul/30/federal-agents-portland-oregon-trump-troops (last visited Dec. 8, 2023).

[7]     Centers for Disease Control & Prevention, Facts About Riot Control Agents Interim Document, *available at* https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp (last visited Dec. 8, 2023).

[8]     Matthew Roza, *Are Protestors Getting Sprayed With Expired Teargas? If so, That's Not Good*, Salon.com (July 28, 2020, 7:00 PM), https://www.salon.com/2020/07/28/experts-alarmed-at-reports-of-expired-tear-gas-being-sprayed-on-protesters/ (last visited Dec. 8, 2023).

41.

"Pepper-spray" and "OC" (oleoresin capsicum) aerosols are chemical compounds derived from chili peppers.  Capsaicin is the compound that makes chili peppers spicy hot.  There are powder forms of these compounds as well.  Pepper-spray, like tear gas, attacks mucous membranes in the eyes and respiratory system, forcing eyes to close and flood with tears and generating coughing fits and difficulty in breathing.  Pepper-spray also induces an intense burning sensation.  The immediate effects can last anywhere from 15 minutes to one hour or more.

42.

"Pepper-spray balls" are round plastic projectiles that release a powdered substance on impact that has effects like those of pepper spray.  Pepper-spray balls are fired from a pistol or AR-15 like "launcher" using compressed air.  Some varieties of launchers allow for adjustable kinetic impact.  In addition to the dangers of pepper spray, pepper-spray balls carry the dangers inherent in any projectile that is shot at someone up to and including blindness, cuts, abrasions, bruising, skin welts and concussion.  Their accuracy declines over relatively short distances, creating a high risk of bystander injury.

B. Kinetic Impact Projectiles

43.

"Rubber bullets or pellets," "baton rounds," "sponge rounds" and "bean bag" rounds are lightweight, high-speed kinetic impact projectiles fired from a rifle-like "launcher" or shotgun at velocities similar to live ammunition, but their design causes a rapid slowdown during flight. They are loosely designed to duplicate the impact of a baton strike from a distance at or beyond 60 feet.  The rounds deliver the same kinetic force as a 90 mile per hour major league baseball

pitch.  If struck in the head, face, eye, neck, kidney, or groin, they can produce grievous injuries or death.[9]  Their accuracy declines over relatively short distances creating a high risk of bystander injury.

### C. Disorientation Devices

44.

"Disorientation devices" or "flashbangs" or "stun grenades" create a loud explosion and/or a very bright flash of light.  They are made of both metal and plastic parts that may fragment during the explosion and carry risks of blast injuries and hearing loss.  They may be deployed by hand or by a launcher.  Explosions in close proximity to a person can cause or lead to amputation, fractures, burns, blindness and other serious injuries.  It is impossible to control exactly where a grenade detonates.

### Surveillance of Protesters

45.

On Plaintiffs' information and belief, Defendant's agents and employees obtained surveillance of protesters in and around the protest zone, including video and data images from fixed and mobile cameras, cell phone data, drone footage, and other digital media.  This surveillance information provides independent confirmation of class membership.  In addition, it provides important evidence of the conduct of Defendant's agents and employees and proof of the claims of Plaintiffs and the class.

---

[9]     International Network of Civil Liberties Organizations, *Lethal in Disguise: The Health Consequences of Crowd-Control Weapons*, *available at* https://phr.org/wp-content/uploads/2018/09/lethal-in-disguise.pdf (last visited Aug. 22, 2023).

**Defendants' Violations of Plaintiffs' Rights**

46.

Plaintiffs attended the Black Lives Matter protests in July 2020 and were exposed to tear gas on one or more occasions as set out in more detail below. In addition, Plaintiffs Urbani and Maher were struck by munitions, Plaintiff West was harmed by a concussion grenade, and Plaintiff Maher was beaten.

47.

Plaintiff Urbani attended demonstrations and was exposed to tear gas in the protest zone on July 24, 2020.  As a result of exposures to the tear gas, Plaintiff Urbani suffered pain, discomfort, mental distress, respiratory distress, temporary blindness, and temporary loss of mobility.  In addition, on the same day, Urbani was struck in the left foot by impact munitions fired while standing in the protest zone among a group of nonviolent, peaceful protesters. Plaintiff Urbani was also struck by pepper-spray balls in the head and face causing pain and discomfort.  The impact munitions broke Plaintiff Urbani's great toe, causing pain and suffering, and interference with normal activities of daily life.  At all times, Urbani lawfully and peacefully protested on behalf of Black lives and the Black Lives Matter movement.

48.

Plaintiff West attended demonstrations and was exposed to tear gas in the protest zone on the following days: July 21, 22, 24, and 25.  As a result of exposures to the tear gas, West suffered pain, discomfort, mental distress, respiratory distress, temporary blindness, and temporary loss of mobility.  In addition, on July 25, one or more defendants fired stun grenades close to Plaintiff West, which detonated close to him, causing hearing loss, pain, and

disorientation.  At all relevant times, Plaintiff West lawfully and peacefully protested on behalf of Black lives and the Black Lives Matter movement.

49.

Plaintiff Maher attended demonstrations and was exposed to tear gas in the protest zone on the following days: July 21-22, July 23-24, July 25-26, and July 29-30.  As a result of exposures to the tear gas, Maher suffered pain, discomfort, respiratory distress, temporary blindness, and temporary loss of mobility.  In addition, Plaintiff Maher suffered the following additional harms:

(a)     On July 22, around approximately 12:30-1:00 am, a federal agent wearing military camouflage fatigues beat Maher with a baton while she was walking away from the Hatfield Courthouse near Lownsdale Square.  As a result of this beating, Plaintiff Maher suffered pain, bruising, and fear.

(b)     On July 22, at approximately 2:00-3:00 am, Plaintiff Maher was struck in the head by munitions fired while standing on SW Main St. between 5th and 6th Ave. The munition was a "pepper-spray ball," which impacted her bike helmet and remains lodged within.

As a result of this shooting, Plaintiff Maher suffered fear and concern for her safety.  At all times, she lawfully and peacefully protested on behalf of Black lives and the Black Lives Matter movement.

50.

Defendant used and applied force against Plaintiffs and members of the class without a clearly communicated warning, without a lawful determination and announcement that Plaintiffs

and members of the class were unlawfully assembled, and without first clearly communicating a lawful order to disperse.

## **FIRST CLAIM FOR RELIEF: NEGLIGENCE**

### 51.

Plaintiffs reallege all previous paragraphs as if fully set forth herein.

### 52.

Defendants were negligent in one or more of the following ways that caused harm to Plaintiffs and the class:

(a)     In using tear gas without lawful justification, for the sole purpose of crowd dispersal, or as a pain compliance tool;

(b)     In shooting pepper-spray balls indiscriminately or directly at lawful protestors, including when those protesters were displaying no violence or resistance, or when their back was turned while attempting to retreat or obey an order to disperse;

(c)     In unreasonably spraying pepper spray for the purpose of inhibiting protestors' ability to see;

(d)     The unreasonably beating of their person with batons, fists, or other weapons;

(e)     In arresting protestors and class members without probable cause to do so;

(f)      In exploding or detonating grenades in close proximity to lawfully protesting individuals absent any justification to rebut force, effect a custodial arrest, or preserve life and safety;

(g)     In using and applying a quantum of force that was grossly disproportionate to Plaintiffs' mere presence among protesters, journalists, medics, and bystanders in the vicinity of the Hatfield Courthouse;

(h)     In failing to warn of Defendant's agents' and employees' intention to use force, even though it was reasonably feasible for them to do so; and

(i)     In failing to train its officers, and in fostering a culture of violence against police accountability, peaceful protesters like Plaintiffs and members of the class, even though it was reasonably foreseeable that Defendant's employees and agents would engage in unreasonable force against protestors, including Plaintiffs and members of the class.

53.

As a direct and foreseeable result of Defendant's negligence, Plaintiffs and members of the class suffered physical injury and mental harms, outrage, betrayal, offense, indignity, and insult, causing damage in amounts to be determined at trial.

**SECOND CLAIM FOR RELIEF: BATTERY**

54.

Plaintiffs reallege all previous paragraphs as if fully set forth herein.

55.

Defendant's agents and employees intended to cause harmful or offensive contact with Plaintiffs and members of the class, and did in fact cause harmful or offensive contact with Plaintiffs and members of the class.

22 – COMPLAINT

56.

As a direct result of Defendant's conduct, Plaintiffs and class members suffered physical injury and mental harms, outrage, betrayal, offense, indignity, and insult, causing damage in amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgment against Defendant as follows:

1.      An order certifying this matter as a class or issue class pursuant to FRCP 23;

2.      For compensatory noneconomic and economic damages in an amount to be determined at trial and for prejudgment interest on said sums; and

3.      For Plaintiffs' costs and such other and further relief as the Court may deem just and equitable;

DATED this 19th day of December, 2023.

**Joe Piucci**, OSB No. 135325
PIUCCI LAW LLC
900 SW 13th Ave., Ste. 200
Portland, OR 97205
Tel: (503) 228-7385
joe@piucci.com

**Gabriel Chase**, OSB No. 142948
CHASE LAW, PC
2014 NE Broadway Street
Portland, OR 97232
Tel: (503) 294-1414
gabriel@chaselawpc.net

**Michelle R Burrows**, OSB No. 861606
MICHELLE R. BURROWS P.C.
16869 SW 65th Ave., #367
Lake Oswego, OR 97035
Tel: (503) 241-1955
michelle.r.burrows@gmail.com

/s/ Nadia H. Dahab
**David F. Sugerman**, OSB No. 862984
**Nadia H. Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
Tel: (503) 228-6474
david@sugermandahab.com
nadia@sugermandahab.com

**Christopher A. Larsen**, OSB No. 910679
PICKETT DUMMIGAN WEINGART LLP
210 SW Morrison St., 4th Fl.
Portland, Oregon 97204
Tel: (503) 223-7770
chris@pdw.legal

*Attorneys for Plaintiffs*